**REDACTED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311 Honorable Marianne O. Battani |
| In re: IGNITION COILS | 2:13-cv-01402-MOB-MKM |
| THIS RELATES TO: | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| ALL AUTOMOBILE DEALER ACTIONS | JURY TRIAL DEMANDED |
| | **[FILED UNDER SEAL-HIGHLY CONFIDENTIAL]** |

REDACTED

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"); Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Green Team of Clay Center Inc. ("Plaintiff Green Team"); McGrath Automotive Group, Inc. ("Plaintiff McGrath "); Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Bonneville and Son, Inc. ("Plaintiff Bonneville"); Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou");  John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"); Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota "); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Lee Auto Malls-Topsham,

1

REDACTED

Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan");; Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Bill Pearce Motors d/b/a Bill Pearce Courtesy Honda ("Plaintiff Pearce"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol"); and Apex Motor Corporation ("Plaintiff Apex") ("Plaintiffs") on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and allege as follows:

## NATURE OF ACTION

1.        This lawsuit is brought as a proposed class action against Defendants DENSO Corporation; DENSO International America, Inc. (together, "DENSO Defendants" or "DENSO"); Hitachi Automotive Systems, Ltd.; Hitachi Automotive Systems Americas, Inc. (together, "Hitachi Defendants" or "Hitachi");[1] Mitsubishi Electric Corporation; Mitsubishi Electric US Holdings, Inc.; Mitsubishi Electric Automotive America, Inc. (collectively, "Mitsubishi Defendants" or "Mitsubishi"); Diamond Electric Mfg. Co., Ltd.; Diamond Electric Mfg. Corporation (together, "Diamond Electric Defendants" or

---

[1] For the purposes of this Complaint, the terms "Hitachi Defendants" or "Defendants" also includes the former Hitachi Automotive Systems Group of Hitachi, Ltd., as it existed prior to July 1, 2009, the former Hitachi Unisia Automotive, Ltd. and the former Tokico, Ltd.

REDACTED

"Diamond Electric"); Toyo Denso Co. Ltd.; Weastec, Inc. (together, "Toyo Denso") (all as defined below, and collectively "Defendants"); and unnamed co-conspirators, manufacturers and/or suppliers of Ignition Coils (defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Ignition Coils (defined below). According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the United States automotive industry, raising prices for car manufacturers and consumers alike.

2.       "Ignition Coils" are part of the fuel ignition system of an automobile and release electric energy suddenly to ignite a fuel mixture.

3.       Plaintiffs seek to represent all autombile dealers who, during the period from and including January 1, 2000 through the present (the "Class Period"), purchased vehicles that included one or more Ignition Coil(s) as a component part, which were manufactured or sold by the Defendants, any current or former subsidiary of the Defendants, or any co-conspirator of the Defendants.

4.       Defendants manufacture, market, and/or sell Ignition Coils throughout and into the United States. Defendants, and their co-conspirators (as yet unknown), agreed, combined, and conspired to fix, raise, maintain, and/or stabilize prices and allocate the market and customers in the United States for Ignition Coils.

5.       The DOJ's Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry. As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive

**REDACTED**

parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry. The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

6.       Defendant DENSO Corporation agreed to plead guilty to a two-count criminal Information and to pay a $78 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 until at least February 2010. The combination and conspiracy engaged in by Defendant DENSO Corporation and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.       In addition to the fact that Defendant DENSO Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperate in the government's investigation, several of its high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

REDACTED

8.        On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

9.        On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

10.        On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere. Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe an executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere

11.        On July 16, 2013, the DOJ announced that Defendant Diamond Electric Mfg. Co., Ltd., agreed to plead guilty and to pay a criminal fine of $19 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of,

REDACTED

Ignition Coils sold to automobile manufacturers, including Ford Motor Company, which is headquartered in the United States, as well as Toyota, Fuji Heavy Industries, and certain of their subsidiaries, in the United States and elsewhere, from at least as early as January 2003 until at least February 2010. Significantly, in its annual business report for the period from April 1, 2011 to March 31, 2012, Diamond Electric Mfg. Co., Ltd. noted that North America sales "expanded significantly . . . due to the recovery of the North American automotive market and an expansion in sales of products for Ford Motor Company." (emphasis added). The combination and conspiracy engaged in by Defendant Diamond Electric Mfg. Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

12.     According to Defendant Diamond Electric Mfg. Co., Ltd.'s plea agreement, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Ford, Toyota, and Fuji Heavy Industries, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by Defendant Diamond Electric's U.S. subsidiary, which is located in the Eastern District of Michigan.

13.     On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its and its affiliate, Hitachi Automotive Systems Americas, Inc.'s, unlawful conduct in participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers,

6

**REDACTED**

including, Nissan, Honda, General Motors, Ford, Toyota, Chrysler, and Fuji Heavy Industries, and certain of their subsidiaries, affiliates and suppliers, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010.  For purposes of the plea agreement between Defendant Hitachi Automotive Systems, Ltd. and the United States, "automotive parts" were defined to include, among other parts, Ignition Coils.   Like Diamond Electric, Hitachi sold price-fixed automotive parts, including Ignition Coils, to automobile companies headquartered in the United States. These companies include Ford and General Motors. The combination and conspiracy engaged in by Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

14.     According to the plea agreement of Defendant Hitachi Automotive Systems Ltd., conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Nissan, Honda, General Motors, Ford, Toyota, and others, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by Hitachi Automotive Systems Americas, Inc., which is located in the Eastern District of Michigan.

15.     Also on September 26, 2013, the DOJ announced that Defendant Mitsubishi Electric Corporation ("Mitsubishi Electric") agreed to plead guilty and to pay a criminal fine of $190 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the price of, certain automotive parts sold to automobile manufacturers, including Ford, General Motors, Chrysler, Fuji Heavy Industries, Nissan,

REDACTED

Honda, Toyota, and certain of their subsidiaries, in the United States and elsewhere, from at least as early as January 2000 until at least February 2010. "Automotive parts," for purposes of the plea agreement, included, among other products, starter motors, alternators, and Ignition Coils. Like Diamond Electric and Hitachi, Mitsubishi Electric sold price-fixed automotive parts, including Ignition Coils, to automobile companies headquartered in the United States. These companies include Ford, General Motors, and Chrysler. The combination and conspiracy engaged in by Defendant Mitsubishi Electric and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

16.     According to Defendant Mitsubishi Electric's plea agreement, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Ford, General Motors, Chrysler, Subaru, Honda, Nissan, and others, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by Defendant Mitsubishi Electric's subsidiary Mitsubishi Electric Automotive America, Inc., which is located in the Eastern District of Michigan.

17.     On January 31, 2014, the DOJ announced that Shigehiko Ikenaga, the former president of Diamond Electric, agreed to serve 16 months in a U.S. prison, pay a $5,000 criminal fine and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to fix prices of Ignition Coils installed in automobiles sold in the United States and elsewhere. Also on January 31, 2014, Tatsuo Ikenaga, the former vice-president of Diamond Electric and former president of Diamond Electric's U.S. subsidiary, agreed to serve 13 months in a U.S. prison, pay a $5,000 criminal fine and

**REDACTED**

plead guilty to a one-count criminal Information charging him with participating in a conspiracy to fix prices of Ignition Coils installed in automobiles sold in the United States and elsewhere.

18.     On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles soldin the United States and elsewhere.

19.     On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda, in the United States and elsewhere.

20.     On September 18, 2014, the DOJ announced that a federal grand jury returned a one-count Indictment against Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa and Tomiya Itakura of Hitachi Automotive Systems Ltd. for agreeing to allocate the supply of, rig bids for, and fix, stabilize and maintain the prices of, certain automotive parts sold to various automobile manufacturers such as, Ford, General Motors, Nissan, Toyota, and Honda, and others, and certain of their subsidiaries, in the United States and elsewhere.   During the period covered by the Indictment, Takashi Toyokuni, Ken

9

**REDACTED**

Funasaki, and Kazunobu Tsunekawa worked for Hitachi in the United States and Japan. For purposes of the Indictment, "automotive parts" included, among other parts, Ignition Coils.

21.     Also on September 18, 2014, the DOJ announced that a federal grand jury returned a three-count Indictment against Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito, current and former executives of Mitsubishi Electric, for their participation in a conspiracy to fix the prices of certain automotive parts, including starter motors, alternators, and Ignition Coils.  Count one charged Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, various automotive parts sold to Ford, General Motors, Chrysler, Fuji Heavy Industries, Nissan, Honda, and certain of their subsidiaries, in the United States and elsewhere.  Count two charged Minoru Kurisaki and Hideyuki Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.  Count three charged Hideyuki Saito with knowingly and corruptly persuading, or attempting to persuade, other employees of Mitsubishi Electric to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in an official proceeding.

22.     On April 23, 2015, the DOJ announced that Takashi Toyokuni, a former executive of Defendant Hitachi Automotive Systems Ltd., agreed to serve fifteen months

REDACTED

in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Indictment charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of certain automotive parts, including Ignition Coils, in the United States and elsewhere.

23.         Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of Ignition Coils sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection, and unjust enrichment laws.

24.         As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for Ignition Coils during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

25.         Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws.  Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

REDACTED

26.        This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants, and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

27.        Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

28.        This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Ignition Coils throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in,

**REDACTED**

located in, or doing business throughout the United States, including in this District.  The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

29.　　　　The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

30.　　　　The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on interstate commerce of the United States.  The Defendants' products are sold in the flow of interstate commerce.  In addition, Defendants DENSO,  Diamond Electric, and Toyo Denso each participated in conspiratorial meetings and discussions located in the United States; each participated in price manipulation and market allocation for automotive parts installed in vehicles manufactured and sold in the United States; each coordinated their price fixing schemes and conspiratorial agreements with subsidiaries located in the United States; and each took further actions in furtherance of the conspiracy with employees and co-conspirators located in the United States.

31.　　　　Ignition Coils manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale and therefore constitute import commerce.  To the extent any Ignition Coils are purchased in the United States, and such Ignition Coils do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its

13

**REDACTED**

effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

32.     By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain, and/or stabilize prices and allocate the market and customers in the United States for Ignition Coils, which conspiracy unreasonably restrained trade and adversely affected the market for Ignition Coils.

33.     The Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased or leased a new vehicle in the United States not for resale which included one or more Ignition Coil(s).

## PARTIES

### Plaintiffs

34.     Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period.  During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators.

35.     During the Class Period, Plaintiff Martens purchased vehicles containing Ignition Coils manufactured by one or more of the Defendants or co-conspirators.  Plaintiff Martens also purchased Ignition Coils, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Martens

**REDACTED**

purchased and received both these vehicles and Ignition Coils in the District of Columbia. Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

36.    Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

37.    During the Class Period, Plaintiff Landers purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.   Plaintiff Landers also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Ignition Coils in Arkansas.  Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

38.    Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

39.    During the Class Period, Plaintiff Hammett purchased vehicles containing Ignition Coils manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased Ignition Coils, manufactured by Defendants or their co-conspirators, for

**REDACTED**

its repair and service business, during the Class Period. Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Ignition Coils in Mississippi. Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

40.        Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

41.        During the Class Period, Plaintiff Superstore purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Ignition Coils in Minnesota. Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

42.        Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized GMC dealer. During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee buys GMC-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators. During the Class Period,

REDACTED

Plaintiff Lee bought Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators.

43.     During the Class Period, Plaintiff Lee purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-mentioned vehicles and Ignition Coils in Florida. Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

44.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought Chrysler-, Dodge-, and Jeep-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

45.     During the Class Period, Plaintiff Westfield purchased vehicles containing Ignition Coils manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Ignition Coils in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

**REDACTED**

46.       Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

47.       During the Class Period, Plaintiff V.I.P. purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Ignition Coils, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Ignition Coils in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

48.

49.       Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

50.       During the Class Period, Plaintiff Green Team purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class

REDACTED

Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Ignition Coils in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

51.      Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Ignition Coils  manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils  manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

52.      During the Class Period, Plaintiff McGrath purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Ignition Coils in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

53.      Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

**REDACTED**

54.         During the Class Period, Plaintiff Table Rock purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Table Rock also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Ignition Coils in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

55.         Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators.

56.         During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Archer-Perdue also purchased Ignition Coils , manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Ignition Coils in Nebraska.  Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

57.         Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or

**REDACTED**

their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

58.         During the Class Period, Plaintiff Bonneville purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Bonneville also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Ignition Coils in New Hampshire. Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

59.         Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

60.         During the Class Period, Plaintiff Pitre purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Pitre also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Ignition Coils in New Mexico. Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

61.         Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan. Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought

**REDACTED**

Chevrolet-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

62.         During the Class Period, Plaintiff Patsy Lou purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Patsy Lou also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and Ignition Coils in Michigan.  Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

63.         Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

64.         During the Class Period, Plaintiff John Greene purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff John Greene also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Ignition Coils in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

**REDACTED**

65.         Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.   Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

66.         During the Class Period, Plaintiff Champion purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Champion also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Champion purchased and received both the afore-mentioned vehicles and Ignition Coils in Nevada.   Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

67.         Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.   Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

68.         During the Class Period, Plaintiff Commonwealth Motors purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.     Plaintiff Commonwealth Motors also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Commonwealth Motors purchased

**REDACTED**

and received both the afore-mentioned vehicles and Ignition Coils in Massachusetts. Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

69.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.   Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

70.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.   Plaintiff Commonwealth Volkswagen also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Ignition Coils in Massachusetts.  Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

71.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

**REDACTED**

72.        During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.   Plaintiff Commonwealth Nissan also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and Ignition Coils in Massachusetts.  Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

73.        Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

74.        During the Class Period, Plaintiff Ramey purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Ignition Coils in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

75.        Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet,

REDACTED

Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

76.        During the Class Period, Plaintiff Thornhill purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Thornhill also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Ignition Coils in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

77.        Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

78.        During the Class Period, Plaintiff Lakeland purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Lakeland also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and

**REDACTED**

Ignition Coils in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

79.        Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

80.        During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Salt Lake Valley also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Ignition Coils in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

81.        Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

82.        During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-

27

**REDACTED**

conspirators.  Plaintiff Capitol Chevrolet also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Ignition Coils in Oregon.  Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

83.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

84.     During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Ignition Coils in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

85.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Ignition Coils manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators during the Class Period.

**REDACTED**

86.          During the Class Period, Plaintiff Wade purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Wade also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Wade purchased and received both the afore-mentioned vehicles and Ignition Coils in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

87.          Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Ignition Coils manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators during the Class Period.

88.          During the Class Period, Plaintiff Johnson purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.   Plaintiff Johnson also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Ignition Coils in Mississippi.   Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

89.          Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Ignition Coils manufactured by the Defendants or their co-

**REDACTED**

conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators.

90.         During the Class Period, Plaintiff Hartley purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Hartley also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Ignition Coils in New York. Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

91.         Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Ignition Coils manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators during the Class Period.

92.         During the Class Period, Plaintiff Lee Honda purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Lee Honda also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Ignition Coils in Maine. Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

93.         Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-

**REDACTED**

brand cars containing Ignition Coils manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators during the Class Period.

94.     During the Class Period, Plaintiff Topsham purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Topsham also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Topsham purchased and received both the afore-mentioned vehicles and Ignition Coils in Maine. Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

95.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Ignition Coils manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators during the Class Period.

96.     During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Cannon Nissan also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Ignition Coils in Mississippi. Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

**REDACTED**

97.       Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.  Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

98.       During the Class Period, Plaintiff Shearer purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Shearer also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Ignition Coils in Vermont. Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

99.       Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as wells as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

100.      During the Class Period, Plaintiff Empire Nissan purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Empire Nissan also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.   Plaintiff Empire Nissan purchased and received both the afore-mentioned

**REDACTED**

vehicles and Ignition Coils in California.  Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

101.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer, who bought Subaru-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

102.     During the Class Period, Plaintiff Hodges purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Hodges also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.  Plaintiff Hodges purchased and received both the afore-mentioned vehicles and Ignition Coils in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

103.     Plaintiff Weir has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

104.     Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period.  Plaintiff Ancona was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators.

**REDACTED**

105.        During the Class Period, Plaintiff Ancona purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Ancona also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ancona purchased and received both the afore-mentioned vehicles and Ignition Coils in Kansas.  Plaintiff Ancona has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

106.        Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period.  Plaintiff Pearce was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators.

107.        During the Class Period, Plaintiff Pearce purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pearce also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Pearce purchased and received both the afore-mentioned vehicles and Ignition Coils in Nevada.  Plaintiff Pearce has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

108.        Plaintiff Bristol is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee.  Plaintiff Bristol is an authorized Toyota dealer during the Class Period, who purchased Toyota- brand cars containing Ignition Coils

**REDACTED**

manufactured by the Defendants or their co-conspirators, as well as Ignition Coils manufactured by the Defendants or their co-conspirators.

109.    During the Class Period, Plaintiff Bristol purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Bristol also purchased Ignition Coils manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bristol purchased and received both the afore-mentioned vehicles and Ignition Coils in Tennessee. Plaintiff Bristol has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

110.    Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont. Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Ignition Coils manufactured by one or more of the Defendants or their co-conspirators, as well as Ignition Coils manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

111.    During the Class Period, Plaintiff Apex purchased vehicles containing Ignition Coils manufactured by one or more Defendants or their co-conspirators. Plaintiff Apex also purchased Ignition Coils, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Apex purchased and received both the afore-mentioned vehicles and Ignition Coils in Vermont. Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

**Defendants**

112.    When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that

REDACTED

corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

**DENSO Defendants**

113.        Defendant DENSO Corporation is a Japanese corporation with its principal place of business in Kariya, Aichi Prefecture, Japan. Defendant DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period.

114.        Defendant DENSO International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. Defendant DENSO International America, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

115.        DENSO Corporation is the second largest North American automotive supplier overall.

**REDACTED**

116.     In 2010, DENSO was the global leader and supplied 1 in every 4 ignition systems in vehicles with spark plugs.

117.     In its 2002 Annual Report, DENSO highlighted that it captured the "leading global market share" for Ignition Coils.

118.     In 2008, DENSO became just one of ten companies of 800 North American automotive parts suppliers that were named Chrysler's "First Supplier of Choice," securing its position as incumbent for a number of supplied parts.

119.     In 2011, DENSO launched a direct ignition coil product segment that comprised 22 part numbers covering 28 million units in operation for vehicles manufactured by Toyota, Honda, GM, and Ford models.  For the overall ignition coil market, DENSO produced 60 part numbers in 2011 for Ford, GM, Nissan, Honda, Mazda, and Toyota, covering more than 72 million units in operation.

**Diamond Electric Defendants**

120.     Defendant Diamond Electric Mfg. Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan.  Diamond Electric Mfg. Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.

121.     Defendant Diamond Electric Mfg. Corporation is a Michigan corporation with its principal place of business in Dundee, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Diamond Electric Mfg. Co., Ltd. Diamond Electric Mfg. Corporation manufactured, marketed, and/or sold Ignition Coils that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control

37

REDACTED

and direction of its Japanese parent. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## Hitachi Defendants

122.        Defendant Hitachi Automotive Systems, Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Hitachi Automotive Systems, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period.

123.        Defendant Hitachi Automotive Systems Americas, Inc. is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Hitachi Automotive Systems, Ltd.  Hitachi Automotive Systems Americas, Inc. manufactured, marketed, and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## Mitsubishi Electric Defendants

124.        Defendant Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Mitsubishi Electric Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period.

125.        Defendant Mitsubishi Electric US Holdings, Inc. is a Delaware corporation with its principal place of business in Cypress, California.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric Corporation. Defendant

REDACTED

Mitsubishi Electric US Holdings, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

126.     Defendant Mitsubishi Electric Automotive America, Inc. is a Delaware corporation with its principal place of business in Mason, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsubishi Electric US Holdings. Defendant Mitsubishi Electric Automotive America, Inc. manufactured, marketed, and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its United States or Japanese parents.

**Toyo Denso Defendants**

127.     Toyo Denso Co. Ltd. is a Japanese Corporation with its principal place of business in Tokyo, Japan. Defendant Toyo Denso Co. Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this District, during the Class Period.

128.     Defendant Weastec Inc. is an Ohio corporation with its principal place of business in Hillsboro, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Denso Co. Ltd. Defendant Weastec, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Ignition Coils that were sold and purchased throughout the United States, including in this

39

REDACTED

District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## AGENTS AND CO-CONSPIRATORS

129.      Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

130.      Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

131.      Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

### A.  The Ignition Coil Industry

132.      "Ignition Coils" are part of the fuel ignition system of an automobile and release electric energy suddenly to ignite a fuel mixture. Various types of Ignition Coils manufactured by Defendant Diamond Electric are shown below.

### Coil on Plug

**REDACTED**

   

| Pencil Style | Single Output | Dual Output | Dual Output With Integrated Igniter |

### Distributorless Ignition Systems

    

2 Output Side Terminal     4 Output Side Terminal     6 Output Side Terminal     6 Output Top Terminals     6 Output Bolt-on Cassette Package

### Distributor Based Single Coil

  

Single Output Epoxy Filled          Single Output Epoxy Filled with Ballast Resistor

133.    Ignition Coils are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.

134.    For new cars, the OEMs – mostly large automotive manufacturers such as Ford Motor Company, Toyota, General Motors, etc. – purchase Ignition Coils directly from Defendants.  Ignition Coils may also be purchased by component manufacturers who

**REDACTED**

then supply such systems to OEMs. These component manufacturers are also called "Tier 1 Manufacturers" in the industry. Tier 1 Manufacturers supply Ignition Coils directly to an OEM.

135.       When purchasing Ignition Coils, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model-specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  OEMs procure Ignition Coils and other parts for U.S.-manufactured vehicles in the United States and elsewhere.

136.       Defendants and their co-conspirators supplied Ignition Coils to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Ignition Coils (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States.

137.       Plaintiffs and members of the proposed Classes purchased Ignition Coils indirectly from one or more of the Defendants.  By way of example, automobile dealers indirectly purchase Ignition Coils from the Defendants when they purchase new vehicles to sell or lease to consumers.

**REDACTED**

138.        In 2001, Mitsubishi Electric obtained an 8-year deal to supply GM engines with 2 million Ignition Coils per year.

139.        In 2002, DENSO Corporation was the sole supplier of the spark plug component of the ignition system for the vehicles manufactured by Toyota.  In 2010, DENSO was the global leader and supplied 1 in every 4 ignition systems in vehicles with spark plugs.

140.        In its 2002 Annual Report, DENSO highlighted that it captured the "leading global market share" for Ignition Coils.

141.        In 2008, DENSO became just one of ten companies of 800 North American automotive parts suppliers that were named Chrysler's "First Supplier of Choice," securing its position as incumbent for a number of supplied parts.

142.        In 2011, DENSO launched a direct Ignition Coil product segment that comprised 22 part numbers covering 28 million units in operation for vehicles manufactured by Toyota, Honda, General Motors and Ford models. For the overall Ignition Coil market, DENSO produced 60 part numbers in 2011 for Ford, General Motors, Nissan, Honda, Mazda and Toyota, covering more than 72 million units in operation.

   **B.  The Structure and Characteristics of the Ignition Coils Market Render the Conspiracy More Plausible**

143.        The structure and other characteristics of the Ignition Coils market in the United States is conducive to a price-fixing agreement and has made collusion particularly attractive in this market.  Specifically, the Ignition Coils market: (1) has high barriers to entry; and (2) has inelasticity of demand.

   **1.    The Ignition Coils Market Has High Barriers to Entry**

144.        A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the

REDACTED

supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

145.        There are substantial barriers that preclude, reduce, or make more difficult entry into the Ignition Coils market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

146.        The Defendants own several patents related to the manufacture of Ignition Coils.  For example, the Hitachi Defendants, the DENSO Defendants, the Mitsubishi Defendants, the Diamond Electric Defendants, and the Toyo Denso Defendants each own at least two patents related to Ignition Coils for automotive vehicles.  These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

147.        In addition, OEMs cannot change Ignition Coil suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Ignition Coils it purchases for a vehicle are then integrated with the other components of the starting and charging systems of the particular vehicle model.  Thus, Ignition Coil manufacturers and OEMs must agree on a design that is unique to a particular vehicle model.  It would be difficult for a new competitor to enter the market after a vehicle has been specifically designed to be integrated with a particular Ignition Coil.

## 2.    There is Inelasticity of Demand for Ignition Coils

148.        "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase

**REDACTED**

in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so they continue to purchase despite a price increase.

149.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

150.     Demand for Ignition Coils is highly inelastic because there are no close substitutes for these products.  In addition, customers must purchase Ignition Coils as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.  Automobile dealers wanting to purchase a car simply have no choice but to purchase Ignition Coils.

### C.  Government Investigations

151.      A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada, and Japan, aimed at suppliers of automotive parts in general, and Ignition Coils in particular.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

REDACTED

152.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

153.     On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers.  The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

154.     The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.  In February 2010, the JFTC raided the Tokyo offices of DENSO Corporation as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.According to its 2011 Annual Report, DENSO Corporation was investigated on July 20, 2011 at various locations, including in Kariya, Aichi and some other sales branches in Japan.  And according to its 2011 Annual Report, Mitsubishi Electric has been subject to investigations conducted by the JFTC since July 2011.

155.     The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," DOJ Spokeswoman Gina Talamona said.

REDACTED

156.         Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and searched the offices of these companies, including DENSO Corporation's subsidiary in Southfield, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

157.         To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**Defendant Diamond Electric Mfg. Co., Ltd. Pleads Guilty to Price-Fixing Certain Automotive Parts**

158.         On July 16, 2013, the DOJ announced that Defendant Diamond Electric Mfg. Co., Ltd. agreed to pay a $19 million criminal fine and plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Ignition Coils sold to Ford Motor Company, Toyota, Fuji Heavy Industries, and certain of their subsidiaries in the United States and elsewhere, from at least as early as July 2003 until at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

**REDACTED**

159.        According to the Information filed, Defendant Diamond Electric Mfg. Co. and its co-conspirators carried out the Ignition Coils conspiracy by:

(a)        participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)        agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)        agreeing, during those meetings, conversations, and communications, to allocate the supply of Ignition Coils sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)        agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)        submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)        selling Ignition Coils to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)        accepting payment for Ignition Coils sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

**REDACTED**

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)      employing measures to keep their conduct secret, including but not limited to using code names and meeting at remote locations.

160.      In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said, "Those who engage in price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

**Defendant Hitachi Automotive Systems, Ltd. Pleads Guilty to Price-Fixing Certain Automotive Parts**

161.      On September 26, 2013, the DOJ announced that Defendant Hitachi Automotive Systems, Ltd. agreed to pay a $195 million criminal fine and to plead guilty to a one-count criminal Information charging it with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts, including Ignition Coils, sold to Nissan, Honda, General Motors, Ford Motor Company, Toyota, Chrysler, Fuji Heavy Industries, and certain of their subsidiaries in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1. For purposes of Hitachi's plea agreement, "automotive parts" is defined to include, among other automotive parts, Ignition Coils.

162.      According to the Information filed, Defendant Hitachi Automotive Systems, Ltd. and its co-conspirators carried out the Ignition Coils conspiracy by:

**REDACTED**

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of automotive parts, including Ignition Coils, sold to automobile manufactures in the United States and elsewhere;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling automotive parts, including Ignition Coils, to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for automotive parts, including Ignition Coils, sold to automobile manufacturers in the United State and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

REDACTED

     (i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

**Defendant Mitsubishi Electric Corporation Pleads Guilty to Price-Fixing**

163.     On September 26, 2013, the DOJ announced that Defendant Mitsubishi Electric Corporation agreed to pay a $190 million criminal fine and plead guilty to a one-count Information charging it with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts, including Ignition Coils, sold to automobile manufacturers, including Ford Motor Company, General Motors, Chrysler, Fuji Heavy Industries, Nissan, Honda, and certain of their subsidiaries in the United States and elsewhere, from at least as early as January 2000 through at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. For purposes of Mitsubishi Electric's plea agreement, "automotive parts" are defined to include, among other parts, Ignition Coils.

164.     According to the Information filed, Defendant Mitsubishi Electric and its co-conspirators carried out the automotive parts combination and conspiracy by, among other things, the following:

     (a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

     (b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

REDACTED

(c)      agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts, including Ignition Coils, sold to automobile manufacturers in the United States and elsewhere;

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling certain automotive parts, including Ignition Coils, to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for certain automotive parts, including Ignition Coils, sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme;

(i)      employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

**D.   Likely Existence of a Cooperating Defendant**

165.      The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has

REDACTED

been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

166.        In light of the guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**E.  Additional Guilty Pleas in Related Markets in the Automotive Parts Industry**

167.        On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

168.        In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers."  Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."   The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

REDACTED

169.        On January 30, 2012, the DOJ announced that Yazaki Corporation agreed to plead

guilty and to pay a $470 million criminal fine and Defendant DENSO Corporation agreed

to plead guilty and to pay a $78 million criminal fine for their respective involvement in

multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to

automobile manufacturers in the United States.  According to the three-count criminal

Information filed against Yazaki, it engaged in three separate conspiracies in violation of

the Sherman Act, 15 U.S.C. § 1: (i) to rig bids for and to fix, stabilize, and maintain the

prices of, automotive wire harnesses and related products sold to certain automobile

manufactures in the United States and elsewhere from at least as early as January 2000

and continuing until at least February 2010; (ii) to rig bids for and to fix, stabilize, and

maintain the prices of, instrument panel clusters sold to certain automobile manufactures

in the United States and elsewhere from at least as early as December 2002 until at least

February 2010; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an

automobile manufacture in the United States and elsewhere.  According to the two-count

felony charge against Defendant DENSO Corporation, it engaged in conspiracies to rig

bids for, and to fix, stabilize, and maintain the prices of, ECUs and HCPs sold to an

automobile manufacturer in the United States and elsewhere from at least as early as

March 2004 and continuing until at least February 2010.

170.        In the press release announcing the fines against Yazaki Corporation, its

executives, and Defendant DENSO Corporation, Ms. Pozen vowed to continue the

investigation into "pernicious cartel conduct that results in higher prices to American

consumers . . . ."  In the same press release, Special Agent in Charge Andrew G. Arena

said that "[t]his criminal activity has a significant impact on the automotive

**REDACTED**

manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

171.     Ms. Pozen said there is no doubt **consumers** were hurt financially by the automotive wire harness price-fixing conspiracy.  She further stated:  "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

172.     On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

173.     On April 3, 2012, the DOJ announced that G.S. Electech, Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

174.     On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

175.     On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a

55

REDACTED

$20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

176.        On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty to a two-count criminal Information and to pay a $14.5 criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

177.        On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

178.        On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

**REDACTED**

179.       On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

180.       On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article.  He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered.  ***I say the biggest with respect to the <u>impact</u> on U.S. businesses and <u>consumers</u>, and the number of companies and executives that are subject to the investigation.***"  (emphasis added).

181.       On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere. Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe an executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

**REDACTED**

182.       On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its involvement in the conspiracy alleged herein.

183.       On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including high intensity discharge ("HID") ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

184.       On September 26, 2013, nine Japanese automotive suppliers, including Defendants Hitachi Automotive Systems Ltd. and Mitsubishi Electric, agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different products:

(a)       Defendant Hitachi Automotive Systems Ltd. agreed to plead guilty and pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others parts, Ignition Coils;

(b)       Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

58

**REDACTED**

(c)     Defendant Mitsubishi Electric Corporation agreed to plead guilty and pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts, including among other parts, Ignition Coils, sold to automobile manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(e)     T.RAD Co. Ltd. agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the pries of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize

**REDACTED**

and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(i)      Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay a $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

185.      On the same day, September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers.  In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct."  Holder also described how the conspiracies worked:  "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies.  In order to keep their illegal conduct secret, they used code names and met in remote locations.  Then they followed up with each other regularly to make sure the collusive agreements were being adhered to."  Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

186.      The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.

**REDACTED**



187.     On October 9, 2013, Takata Corporation announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

188.     On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and constant-velocity-joint boots installed in automobiles sold in the United States and elsewhere.

189.     On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

REDACTED

190.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive high-intensity discharge (HID) lamp ballasts installed in cars sold in the United States and elsewhere.

191.    On January 31, 2014, the DOJ announced that Shigehiko Ikenaga, the former president of Diamond Electric, agreed to serve 16 months in a U.S. prison, pay a $5,000 criminal fine and plead guilty to a one-count criminal Information charging him with participating in the conspiracy alleged herein.  Also on January 31, 2014, the DOJ announced that Tatsuo Ikenaga, the former vice-president of Diamond Electric and former president of Diamond Electric's U.S. subsidiary, agreed to serve 13 months in a U.S. prison, pay a $5,000 criminal fine and plead guilty to a one-count criminal Information charging him with participating in the conspiracy alleged herein.

192.    On February 3, 2014, the DOJ announced that Defendant Aisan Industry Co. Ltd. agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

193.    On February 13, 2014, the DOJ announced that Bridgestone Corp. agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

194.    On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a

REDACTED

U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

195.        On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

196.        On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda, in the United States and elsewhere.

197.        On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and pay a $52.1 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in cars sold to automobile manufacturers in the United States and elsewhere.

198.        On September 18, 2014, the DOJ announced that a federal grand jury returned a one-count Indictment against Takashi Toyokuni, Ken Funasaki, Kazunobu Tsunekawa and Tomiya Itakura of Hitachi Automotive Systems Ltd. for agreeing to allocate the supply of, rig bids for, and fix, stabilize and maintain the prices of, certain automotive

**REDACTED**

parts sold to various automobile manufacturers such as, Ford Motor Company, General Motors, Nissan, Toyota, and Honda, and others, and certain of their subsidiaries, in the United States and elsewhere.  During the period covered by the Indictment, Takashi Toyokuni, Ken Funasaki, and Kazunobu Tsunekawa worked for Hitachi in the United States and Japan.  For purposes of the Indictment, "automotive parts" included, among other parts, Ignition Coils.

199.     Also on September 18, 2014, the DOJ announced that a federal grand jury returned a three-count Indictment against Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito, current and former executives of Mitsubishi Electric, for their participation in a conspiracy to fix the prices of certain automotive parts, including starter motors, alternators, and Ignition Coils.  Count one charged Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito with participating in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, various automotive parts sold to Ford, General Motors, Chrysler, Fuji Heavy Industries, Nissan, Honda, and certain of their subsidiaries, in the United States and elsewhere.  Count two charged Minoru Kurisaki and Hideyuki Saito with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.  Count three charged Hideyuki Saito with knowingly and corruptly persuading, or attempting to persuade, other employees of Mitsubishi Electric to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United

REDACTED

States and elsewhere with the intent to impair the objects' availability and integrity for use in an official proceeding.

200.     On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

201.     On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, rig bids for, and fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

202.     On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

203.     On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

204.     On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a criminal fine of $3.2 million for its role in a conspiracy to allocate the

65

**REDACTED**

sales of, rig bids for, and fix, raise, and maintain the prices of compressors used in air conditioning systems sold to Nissan North America, Inc. in the United States and elsewhere.

205.      On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and to pay a criminal fine of $57.8 million for its role in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold in the United States and elsewhere.

206.      On April 23, 2015, the DOJ announced that Takashi Toyokuni, a former executive of Defendant Hitachi Automotive Systems Ltd., agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Indictment charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, among other auto parts, Ignition Coils, sold in the United States and elsewhere.

207.      On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda, in the United States and elsewhere.

208.      To date, thirty-five companies and fifty-five executives have been charged in the Antitrust Division's ongoing investigation into price fixing and bid rigging in the automotive parts industry.  Each of the thirty-five companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay a total of more than $2.5 billion in criminal fines.

**REDACTED**

209.      As stated by the FBI's Special Agent in Charge, Andrew G. Arena in a January 30, 2012 press release, "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."  As Mr. Arena previously said in a September 29, 2011 press release, "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system. The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

   F.  **Illustrative Examples**

**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**



**REDACTED**

## <u>CLASS ACTION ALLEGATIONS</u>

222.        Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that, during the Class Period, (a) indirectly purchased Ignition Coils manufactured or sold by a Defendant or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Ignition Coils manufactured or sold by a Defendant or any current or former subsidiary, affiliate thereof or co-conspirator

223.        Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state antitrust, unfair competition, and consumer protection laws as well as common law unjust enrichment on behalf of the following class (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Ignition Coils manufactured or sold by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Ignition Coils manufactured or sold by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

224.        The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, any judicial officer presiding over this matter, persons who purchased Ignition Coils directly, and persons in the End-Payor Class, as defined in the End-payor complaint.

225.        While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

**REDACTED**

226.       Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of the Defendants' and their co-conspirators' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

> (a) Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Ignition Coils sold in the United States;

(j)       The identity of the participants of the alleged conspiracy;

(k)       The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(l)       Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(m)       Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(n)       Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(o)       Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

**REDACTED**

(p)     The effect of the alleged conspiracy on the prices of Ignition Coils sold in the United States during the Class Period;

(q)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(r)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(s)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(t)     The appropriate class-wide measure of damages for the Damages Class.

227.     Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Ignition Coils purchased indirectly from the Defendants and/or their co-conspirators.

228.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

229.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

REDACTED

230.          Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

231.          The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

### PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

232.          The Defendants' price-fixing conspiracy had the following effects, among others:

(a)          Price competition has been restrained or eliminated with respect to Ignition Coils;

(b)          The prices of Ignition Coils have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)          Indirect purchasers of Ignition Coils have been deprived of free and open competition;

(d)          Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Ignition Coils they sold to Plaintiffs and the Classes, firms who sold Defendants' Ignition Coils and vehicles to Plaintiffs and the Classes passed Defendants' overcharges on to them;

**REDACTED**

(e)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes;

(f)     Automobile dealers purchasing Ignition Coils and vehicles containing Ignition Coils have been deprived of free and open competition; and,

(g)     Indirect purchasers of Ignition Coils paid artificially inflated prices

233.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Ignition Coils, as a result of the Defendants conspiracy.

234.     The markets for Ignition Coils and the market for vehicles are inextricably linked and intertwined because the market for Ignition Coils exists to serve the vehicle market. Without the vehicles, the Ignition Coils have little to no value because they have no independent utility.   Indeed, the demand for vehicles creates the demand for Ignition Coils.   As stated in the 2010 Annual Report of Lear Corporation, an automotive parts supplier:   "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

235.     Ignition Coils are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.   As a result, Ignition Coils follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and costs attributable to Ignition Coils can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

236.     Just as Ignition Coils can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of

**REDACTED**

Ignition Coils affect prices paid by indirect purchasers of new motor vehicles containing Ignition Coils.

237.        Ignition Coils have their own part numbers, which permit them to be tracked.

238.        Ignition Coils are pieces of sophisticated equipment that are necessary to operate a vehicle.

239.        Ignition Coils are found in every modern vehicle and can be removed from a finished vehicle and replaced.

240.        The Ignition Coils subject to the Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles.  Whether Ignition Coils are sold by themselves or in vehicles, their purpose is to be inserted into vehicles.

241.        The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig, or stabilize the price of Ignition Coils and, as a direct and foreseeable result, the price of new motor vehicles containing Ignition Coils. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously.  That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs.  Thus, it is possible to isolate and identify only the impact of an increase in the price of Ignition Coils on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time.  A regression model can explain how variation in the price of Ignition Coils affects changes in the price of new

77

**REDACTED**

motor vehicles.   In such models, the price of Ignition Coils would be treated as an independent or explanatory variable.   The model can isolate how changes in the price of Ignition Coils impact the price of new motor vehicles containing Ignition Coils while controlling for the impact of other price-determining factors.

242.        The precise amount of the overcharge impacting the prices of new motor vehicles containing Ignition Coils can be measured and quantified.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution.   Thus, the economic harm to Plaintiffs and class members can be quantified.

243.

244.        By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Ignition Coils than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent, and Plaintiffs' and Class members' damages are measurable.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.    The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims.

245.        Plaintiffs repeat and re-allege the allegations set forth above.

246.        Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the

REDACTED

claims set forth herein, until (at the earliest) July 16, 2013, the date that the DOJ publicly

announce Defendant Diamond Electric Mfg. Co., Ltd.'s anticipated guilty plea.[2]

247.      Plaintiffs and the members of the Classes are automobile dealers who purchased

vehicles containing Ignition Coils.

248.      They had no direct contact or interaction with the Defendants in this case and had

no means from which they could have discovered the combination and conspiracy

described in this Complaint before July 16, 2013, the date that the DOJ publicly

announced Defendant Diamond Electric Mfg. Co., Ltd.'s anticipated guilty plea.

249.      No information in the public domain was available to Plaintiffs and members of

the Classes prior to July 16, 2013, the date that the DOJ publicly announced Diamond

Electric Mfg. Co., Ltd.'s anticipated guilty plea, that revealed sufficient information to

suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig

bids for Ignition Coils.  Plaintiffs and the members of the Classes had no means of

obtaining any facts or information concerning any aspect of the Defendants' dealings

with OEMs or other direct purchasers, much less the fact that they and their co-

conspirators had engaged in the combination and conspiracy alleged herein.

---

[2] Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy
alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein,
until (at the earliest), January 16, 2015, for the Toyo Denso Defendants, ███████████████
███████████████████████████████████  No information in the public domain was available to
the Plaintiffs and the members of the Classes prior to this date that revealed sufficient
information to suggest that the Toyo Denso Defendants were involved in the combination or
conspiracy alleged herein.  Therefore, the statute of limitations did not begin to run because
Plaintiffs and members of the Classes did not and could not discover their claims, or in the
alternative, because fraudulent concealment tolled the statute of limitations, until January 16,
2015 with respect to the Toyo Denso Defendants.

REDACTED

250.     For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and members of the Classes have alleged in this Complaint.

### B.     Fraudulent Concealment Tolled the Statute of Limitations

251.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 16, 2013, the date that the DOJ publicly announced Defendant Diamond Electric Mfg. Co., Ltd.'s anticipated guilty plea.[3]

252.      Because the Defendants' agreements, understandings, and conspiracies were kept secret until July 16, 2013, Plaintiffs and the members of the Classes were unaware of the Defendants' unlawful conduct, and they did not know before then that they were paying supra-competitive prices for Ignition Coils throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and members of the Classes that indicated to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

253.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

---

[3] *See* footnote five.

REDACTED

254.     Specifically, as Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

255.     As stated in the Information filed against Defendant Hitachi Automotive Systems, Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

256.     Also, a former executive of Defendant DENSO, Kazuaki Fujitani, pleaded guilty to a charge of obstruction of justice in which he admitted that he "corruptly destroyed and concealed a record and document, that is, by deleting numerous emails and electronic files" for a related automotive part.

257.     In addition, two employees of Hitachi, Minoru Kurisaki and Hideyuki Saito were charged by the DOJ with knowingly conspiring to obstruct justice by destroying documents and corruptly persuading, and attempting to persuade others, to destroy documents related to an official proceeding, grand jury investigation, and U.S. agency investigation.   The DOJ also charged Hideyuki Saito with obstruction of justice by knowingly and corruptly persuading or attempting to persuade other employees of Mitsubishi Electric to destroy or conceal paper documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere with the intent to impair the objects' availability and integrity for use in official proceedings.

258.     By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.   Ignition Coils are not exempt from antitrust regulation and, thus, before July 16, 2013, Plaintiffs reasonably considered the

**REDACTED**

Ignition Coils industry to be a competitive industry.  Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Ignition Coil prices before July 16, 2013.

259.      Plaintiffs and the members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

260.      Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.  The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs.  The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

261.      Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed,

REDACTED

until July 16, 2013, the date that the DOJ publicly announced Defendant Diamond Electric Mfg. Co., Ltd.'s anticipated guilty plea.

262.     As a result of the Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims of Plaintiffs and the members of the Classes.

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

263.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

264.     The Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

265.     The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

266.     During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Ignition Coils, thereby creating anticompetitive effects.

267.     The anticompetitive acts were intentionally directed at the United States market for Ignition Coils and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Ignition Coils throughout the United States.

268.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Ignition Coils.

**REDACTED**

269.        As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Ignition Coils have been harmed by being forced to pay inflated, supra-competitive prices for Ignition Coils.

270.        In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

271.        Defendants and their co-conspirators' conspiracy had the following effects, among others:

        (a)        Price competition in the market for Ignition Coils has been restrained, suppressed, and/or eliminated in the United States;

        (b)        Prices for Ignition Coils sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

        (c)        Plaintiffs and members of the Nationwide Class who purchased Ignition Coils indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

272.        Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Ignition Coils and vehicles containing Ignition Coils than they would have paid and will pay in the absence of the conspiracy.

273.        Plaintiffs and members of the Nationwide Class will continue to be subject to the Defendants' price-fixing, bid-rigging, and market allocations, which will deprive

REDACTED

Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced Ignition Coils and vehicles containing Ignition Coils.

274.     Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for Ignition Coils and vehicles containing Ignition Coils because they are required to purchase vehicles and Ignition Coils to continue to operate their businesses.

275.     Plaintiffs and members of the Nationwide Class continue to purchase vehicles and Ignition Coils on a regular basis.

276.     Vehicles and Ignition Coils continue to be sold at inflated and supra-competitive prices.

277.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

278.     Plaintiffs and members of the Nationwide Class will be at the mercy of the Defendants' unlawful conduct until the Court orders an injunction.

279.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against the Defendants, preventing and restraining the violations alleged herein.

### SECOND CLAIM FOR RELIEF
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

280.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

281.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Ignition Coils in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

282.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at

**REDACTED**

artificially supra-competitive prices for Ignition Coils and to allocate customers for Ignition Coils in the United States.

283.  In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)   participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Ignition Coils at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Ignition Coils sold in the United States;

(b)   allocating customers and markets for Ignition Coils in the United States in furtherance of their agreements; and

(c)   participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

284.  Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Ignition Coils.

285.  Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

286.  The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)   Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coil price competition was restrained, suppressed, and

**REDACTED**

eliminated throughout Arizona; (2) Ignition Coil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

287.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)     During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Ignition Coils at supra-competitive levels.

**REDACTED**

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Ignition Coils.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Ignition Coils; and (2) Allocating among themselves the production of Ignition Coils.

(d)    The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Ignition Coils has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Ignition Coils sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Ignition Coils directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Ignition Coils than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members

**REDACTED**

of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

288.        Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)        Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Ignition Coil prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Ignition Coils or vehicles in the District of Columbia, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Ignition Coils or vehicles in the District of Columbia, paid supra-competitive, artificially inflated prices for Ignition Coils, including in the District of Columbia.

(b)        During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)        By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

REDACTED

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

289.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq.

(a)     Defendants' unlawful conduct had the following effects: (1) Ignition Coils' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Ignition Coils' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(e)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq.*

290.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

**REDACTED**

(a)     The Defendants' combinations or conspiracies had the following effects: (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[4]

291.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed,

---

[4] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal

**REDACTED**

and eliminated throughout Iowa; (2) Ignition Coils prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

292.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

**REDACTED**

(b)     During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

293.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Maine; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

294.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

295.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

**REDACTED**

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

296.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or

95

**REDACTED**

purchased Ignition Coils or vehicles in Mississippi, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Ignition Coils or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Ignition Coils, including in Mississippi.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

297.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Ignition Coils prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

**REDACTED**

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

298.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Ignition Coils or vehicles in Nevada,  were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Ignition Coils or vehicles in Nevada,   paid supra-competitive, artificially inflated prices for Ignition Coils, including in Nevada.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

299.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

300.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

**REDACTED**

301.        Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)        Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout New York; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Ignition Coils or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Ignition Coils or vehicles in New York, paid supra-competitive, artificially inflated prices for Ignition Coils when they purchased, including in New York, vehicles containing Ignition Coils or vehicles containing Ignition Coils, or purchased vehicles and Ignition Coils that were otherwise of lower quality than they would have been absent Defendants' and their co-conspirators illegal acts, or were unable to purchase products that they otherwise would have purchased absent the illegal conduct.

(b)        During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)        By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.*  The conduct

**REDACTED**

set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

302.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Ignition Coils or vehicles in North Carolina, were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Ignition Coils or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Ignition Coils, including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

REDACTED

303.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq*.

304.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed,

**REDACTED**

and eliminated throughout Oregon; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

305.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Ignition Coils or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of

**REDACTED**

the Damages Class, including those who resided in South Dakota and/or purchased Ignition Coils or vehicles in South Dakota, paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

306.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Ignition Coils or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Ignition Coils or

104

**REDACTED**

vehicles in Tennessee, paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in Tennessee.

(b)     During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

307.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Utah; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq*.

308.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq*.  Accordingly,

**REDACTED**

Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq*.

309.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq*.

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Ignition Coils prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Ignition Coils or vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Ignition Coils or vehicles in West Virginia, paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in West Virginia.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.  Accordingly,

**REDACTED**

Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq.*

310.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

311.     Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement.   Plaintiffs and members of the

REDACTED

Damages Class have paid more for Ignition Coils than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

312.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

313.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD CLAIM FOR RELIEF
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

314.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

315.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

316.      Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

(a)     Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Ignition Coils were sold, distributed, or

**REDACTED**

obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)      Defendants' unlawful conduct had the following effects:  (1) Ignition Coil price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Ignition Coil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(d)      During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)      As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**REDACTED**

317.        Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)      During the Class Period, Defendants marketed, sold, or distributed Ignition Coil(s) in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)      During the Class Period, the Defendants' illegal conduct substantially affected California commerce and consumers.

(c)      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)      Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(e)      Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of

**REDACTED**

the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)     Defendants' acts or practices are unfair to consumers of Ignition Coils  (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)     Defendants' unlawful conduct had the following effects: (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout California; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Ignition Coils or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Ignition Coils or vehicles in California, paid supracompetitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in California.

(h)     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

(j)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

**REDACTED**

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

318.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Ignition Coils were sold, distributed, or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Ignition Coils.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

**REDACTED**

(e)     Moreover, Plaintiffs lacked any meaningful choice in purchasing Ignition Coils because they were unaware of the unlawful overcharge and because they had to purchase Ignition Coils as a necessary part of the vehicles they purchased.

(f)     Defendants' conduct with regard to sales of Ignition Coils, including their illegal conspiracy to secretly fix the price of Ignition Coils at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of Plaintiffs.

(g)     Defendants' unlawful conduct had the following effects:   (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class, including those who resided in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and the Damages Class, including those who resided in the District of Columbia and/or purchased Ignition Coils in the District of Columbia,  paid supra-competitive, artificially inflated prices for Ignition Coils, including in the District of Columbia .

(h)     The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Ignition Coils, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Ignition Coils.

**REDACTED**

(i)     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

319.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

(a)     Defendants' unlawful conduct had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Florida; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

320.

REDACTED

321.        Defendants have engaged in unfair competition or unfair, unconscionable, or
deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)        Defendants and their co-conspirators agreed to, and did in fact, act in
restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at
non-competitive and artificially inflated levels, the prices at which Ignition Coils were
sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements
from Plaintiffs and members of the Damages Class.

(b)        Plaintiffs were not aware of the Defendants' price-fixing conspiracy and
were therefore unaware that they were being unfairly and illegally overcharged.  There
was a gross disparity of bargaining power between the parties with respect to the price
charged by the Defendants for Ignition Coils.  Defendants had the sole power to set that
price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked
any meaningful choice in purchasing Ignition Coils because they were unaware of the
unlawful overcharge and because they had to purchase Ignition Coils in order to be able
to operate their vehicles.  The Defendants' conduct with regard to sales of Ignition Coils,
including their illegal conspiracy to secretly fix the price of Ignition Coils at supra-
competitive levels and overcharge consumers, was substantively unconscionable because
it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the
public.  The Defendants took grossly unfair advantage of Plaintiffs.

(c)        The aforementioned conduct on the part of Defendants constituted
"unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such
conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs
and the members of the Damages Class and the prices paid by them for Ignition Coils as

116

**REDACTED**

set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Ignition Coils.

(d)     Defendants' unlawful conduct had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

322.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Ignition Coils were sold,

**REDACTED**

distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Ignition Coils they had purchased inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)     Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Ignition Coils were misled to believe that they were paying a fair price for Ignition Coils or the price increases for Ignition Coils were for valid business reasons.

(e)     Defendants' unlawful conduct had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout New York; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in and/or made purchases of vehicles or Ignition Coils  in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in and/or made purchases of vehicles or Ignition Coils  in

**REDACTED**

New York, paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in New York.

(f)     Defendants knew that their unlawful trade practices with respect to pricing Ignition Coils would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)     Defendants knew that their unlawful trade practices with respect to pricing Ignition Coils would have a broad impact, causing consumer class members who indirectly purchased Ignition Coils to be injured by paying more for Ignition Coils than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)     During the Class Period, Defendants' marketed, sold, or distributed Ignition Coils in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Ignition Coils in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

323.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Ignition Coils were sold,

**REDACTED**

distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Ignition Coils or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Ignition Coils or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Ignition Coils and vehicles containing Ignition Coils, including in North Carolina.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Ignition Coils and vehicles.  The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy.  The Defendants committed inherently deceptive and self-concealing actions, of which

**REDACTED**

Plaintiffs could not possibly have been aware. Moreover, the Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Ignition Coils in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

324.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[5]

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

---

[5] Dealership Plaintiffs recognize that their claims under the South Carolina Unfair Trade Practices Act were dismissed in previous actions. Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

**REDACTED**

members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

325.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Ignition Coils were sold, distributed, or obtained in Vermont.

(b)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Ignition Coils.  Defendants owed a duty to disclose such facts. Defendants misrepresented to all purchasers during the Class Period that their Ignition Coil prices were competitive and fair.

**REDACTED**

(c)     Defendants' unlawful conduct had the following effects:   (1) Ignition Coils price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Ignition Coils prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Ignition Coils.

(d)     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Ignition Coils, likely misled purchasers acting reasonably under the circumstances to believe that they were purchasing Ignition Coils at prices set by a free and fair market.  Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

326.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

327.     Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra.*, except California. Plaintiffs also bring this claim under the laws of

REDACTED

Missouri, Massachusetts, South Carolina and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those states.

328.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Ignition Coils.

329.     Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Ignition Coils.

330.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

331.     Pursuit of any remedies against the firms from which Plaintiffs and the members of the Damages Class purchased Ignition Coils and vehicles containing Ignition Coils subject to the Defendants' conspiracy would have been futile, given that those firms did not take part in the Defendants' conspiracy.

## **PRAYER FOR RELIEF**

Accordingly, Plaintiffs respectfully request that:

REDACTED

A.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act; and

(c)     An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein.

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.     Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any

**REDACTED**

manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.     Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED:  September 25, 2015                        Respectfully submitted,


      /s/  *Gerard V. Mantese*
Gerard V. Mantese
(Michigan Bar No. P34424)
Alex Blum
Mantese Honigman P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Telephone: (248) 457-9200
gmantese@manteselaw.com

**REDACTED**

ablum@manteselaw.com


Don Barrett
Brian Herrington
David McMullan
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Jonathan W. Cuneo
Joel Davidow
Daniel Cohen
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Telephone: (202) 789-3960
jonc@cuneolaw.com
joel@cuneolaw.com
danielc@cuneolaw.com
vicky@cuneolaw.com


Shawn M. Raiter
Paul A. Sand
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
sraiter@larsonking.com
psand@larsonking.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker
Suite 801
St. Louis, MO  63101
Telephone:  (314) 226-1015
mflannery@cuneolaw.com


Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net


Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com


Gregory Johnson

**REDACTED**

G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*